NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12935


STEPHEN FOSTER[1] & others[2] vs.  COMMISSIONER OF CORRECTION &
others[3] (No. 1).



Suffolk.     May 7, 2020. - June 2, 2020.

Present:  Gants, C.J., Lenk, Gaziano, Lowy, Budd, Cypher,
& Kafker, JJ.


Commissioner of Correction.  Parole.  Commissioner of Public
     Safety.  Governor.  Imprisonment, Safe environment.
     Constitutional Law, Sentence, Imprisonment, Cruel and
     unusual punishment.  Due Process of Law, Sentence,
     Commitment.  Practice, Criminal, Sentence, Execution of
     sentence.  Practice, Civil, Civil commitment.



     Civil action commenced in the Supreme Judicial Court for
the county of Suffolk on April 17, 2020.

     The case was reported by Cypher, J.


     James R. Pingeon for the plaintiffs.

─────────────────────

     [1] On behalf of himself and all others similarly situated.

     [2] Michael Gomes, Peter Kyriakides, Richard O'Rourke, Steven
Palladino, Mark Santos, David Sibinich, Michelle Tourigny,
Michael White, Frederick Yeomans, and Hendrick Davis, on behalf
of themselves and all others similarly situated.

     [3] Chair of the parole board, Secretary of the Executive
Office of Public Safety and Security, and the Governor.

Stephen G. Dietrick for Commissioner of Correction & another.
Ryan P. McManus, Special Assistant Attorney General, for the Governor.
Michael R. Byrne for the parole board.
The following submitted briefs for amici curiae:
Tatum A. Pritchard for Disability Law Center, Inc.
Rachael Rollins, District Attorney for the Suffolk District, & Hon. Jon Santiago, pro se.
Matthew R. Segal for American Civil Liberties Union of Massachusetts & another.

GAZIANO, J.  The plaintiffs, incarcerated inmates serving sentences or individuals who are civilly committed under G. L. c. 123, § 35, commenced this class action in the county court, alleging that their conditions of confinement expose them to unreasonable risks from the COVID-19 pandemic.  They claim, among other things, that the defendants' failure to take readily available steps to reduce the incarcerated population to safe levels so as to permit adequate physical distancing within prison walls constitutes cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution and art. 26 of the Massachusetts Declaration of Rights, and violates substantive due process requirements guaranteed under the Fourteenth Amendment to the United States Constitution and arts. 1, 10, and 12 of the Massachusetts Declaration of Rights.

The plaintiffs sought a preliminary injunction enjoining the Department of Correction (DOC) from (1) housing any prisoner

in a facility where the population exceeds its design-rated capacity and (2) "[h]ousing any prisoner in a cell, room, dorm, or other living area where they must sleep, eat, or recreate within six feet of another person."[4]  To accomplish this, the plaintiffs asked that the DOC be ordered to reduce the number of incarcerated individuals such that the proper physical distancing can be maintained in all facilities.  They also requested that the parole board be ordered to expedite the release of certain groups of inmates, consider the risks of COVID-19 in all parole decisions, and adopt a presumption of release on parole for all inmates who are eligible for parole.[5]  In addition, the plaintiffs sought to enjoin the DOC from continuing to confine individuals who are civilly committed pursuant to G. L. c. 123, § 35.

---

[4] The plaintiffs also asked that the Department of Correction (DOC) be enjoined from housing any inmate in a cell, dormitory, or other living area that does not comply with the minimize size standards established by the Department of Public Health (DPH) as set forth in 105 Code Mass. Regs. §§ 451.320-451.322 (2004); maintaining any medical services unit or medication distribution area in which inmates have to wait within six feet of each other; and transferring any inmate from a county jail to the DOC.

[5] The parole board sought to dismiss all claims against it on the grounds that it is not responsible for conditions of confinement in DOC facilities and has no control over them, and also that the plaintiffs' requests for relief exceed the bounds of the parole board's statutory authority; that motion was denied.  See Foster v. Commissioner of Correction (No. 2), 484 Mass.    ,     (2020)(Foster [No. 2]).

The single justice reserved and reported the case to the full court.[6]  She also remanded the matter to the Superior Court "for fact-finding that will enable the full court to decide the case in the first instance."  A Superior Court judge, by special assignment, conducted a series of evidentiary hearings, took limited testimony from all parties over three days, collected affidavits, and submitted his findings to this court.  We also ordered the defendants to provide answers to additional questions pursuant to Mass. R. A. P. 16 (l), as appearing in 481 Mass. 1628 (2019).

The initial question before us at this stage is whether a preliminary injunction should issue.  This in turn requires a determination whether the plaintiffs are likely to succeed on the merits of their claims.  See Packaging Indus. Group, Inc. v. Cheney, 380 Mass. 609, 616-617 (1980).

To prevail on an Eighth Amendment claim, an individual must establish that the punishment is inconsistent with "the evolving standards of decency that mark the progress of a maturing society."  See Trop v. Dulles, 356 U.S. 86, 100-101 (1958).  Prison officials have a duty under the Eighth Amendment to protect inmates in their custody from the spread of serious,

_____

[6] The Governor moved in this court to dismiss the claims against him on the ground of sovereign immunity; that motion was allowed, and thus, the Governor is no longer a party to this case.  See Foster (No. 2), 484 Mass. at    .

communicable diseases, including where the complaining inmate does not show symptoms of the disease, or where "the possible infection might not affect all of those exposed." Helling v. McKinney, 509 U.S. 25, 33 (1993) ("We have great difficulty agreeing that prison authorities may not be deliberately indifferent to an inmate's current health problems but may ignore a condition of confinement that is sure or very likely to cause serious illness and needless suffering the next week or month or year").

Thus, to be entitled to a preliminary injunction in their claims for unconstitutional conditions of confinement because of the risk of spread of a disease, the incarcerated plaintiffs must show that they are likely to establish that the defendants have been deliberately indifferent to a substantial risk of serious harm to their health or safety. See Estelle v. Gamble, 429 U.S. 97, 103-104 (1976); Torres v. Commissioner of Correction, 427 Mass. 611, 613-614, cert. denied, 525 U.S. 1017 (1998).

It is undisputed, as we recognized in Committee for Pub. Counsel Servs. v. Chief Justice of the Trial Court, 484 Mass. 431, 445 (2020) (CPCS v. Trial Court), that, due to the COVID-19 pandemic, the situation inside the Commonwealth's jails and prisons "is urgent and unprecedented, and that a reduction in the number of people who are held in custody is necessary."

Nonetheless, on the record here, we conclude that the incarcerated plaintiffs are unlikely to succeed on the merits of their claim for violations of the Eighth Amendment, and thus their motion for a preliminary injunction must be denied.

As to the plaintiffs' argument that commitment to a secure facility for substance abuse treatment during the pandemic violates the substantive due process rights of the committed individual, on this record, the plaintiffs do not seem to have a representative class member at this point, and thus are unlikely to succeed on their petition for a class-based preliminary injunction. Nonetheless, some immediate relief is necessary with respect to those who have been civilly committed pursuant to G. L. c. 123, § 35. Under our supervisory authority pursuant to G. L. c. 211, § 3, we conclude that these individuals are entitled to a new hearing to enable a motion judge to take into account treatment limitations in the current circumstances, and to weigh the balance of potential benefits from treatment and the potential harms as a result of being held in wings of prisons and jails or other conditions of confinement during the pandemic.[7]

---

[7] We acknowledge the amicus letters of the American Civil Liberties Union of Massachusetts and the Massachusetts Association of Criminal Defense Lawyers; of the district attorney for the Suffolk district and Hon. Jon Santiago, pro se; and of Disability Law Center, Inc.

Background.  1.  <u>COVID-19 in Massachusetts correctional</u> <u>facilities</u>.  Despite a massive, concerted global containment effort, COVID-19 has continued to spread, both around the world and in Massachusetts.[8]  Few inhabited places worldwide have been spared from infections; the Massachusetts correctional system is not among them.

For many, the virus causes only mild symptoms.  For others, particularly the elderly or those with preexisting conditions, the disease poses a substantial likelihood of serious illness or death.  Indeed, since February 29, 2020, the disease has killed more than 100,000 people in the United States and more than 6,700 people in Massachusetts.  The demographic distribution of severe cases is of particular importance here, because Massachusetts has the highest percentage of elderly prisoners relative to all other States.[9]  Prisoners also have been shown to age more rapidly than the general population, typically developing the chronic conditions and disabilities associated with old age ten to fifteen years earlier than their

---

[8] According to data published by the DPH, on April 17, 2020, the date the plaintiffs' complaint was filed, there were 34,402 confirmed cases of COVID-19 in Massachusetts.  By the date of oral argument on May 7, 2020, that number had more than doubled to 73,721 cases.  As of May 29, there were 95,512 confirmed cases in Massachusetts.

[9] As of May 11, 2020, thirteen percent of the prisoners in DOC custody (957 of 7,343) were age sixty or older and thirty-one percent (2,265) were age fifty or older.

nonincarcerated counterparts.  According to estimates by the Commissioner of Correction (commissioner), fifty percent of the inmates under her care and control either are over sixty years of age or have an underlying medical condition that puts them at heightened risk for a severe course of COVID-19, should they contract the virus.

In CPCS v. Trial Court, 484 Mass. at 456 (Appendix B), we appointed a special master and established daily reporting requirements in order to monitor the populations of Massachusetts correctional institutions, and the progression of COVID-19 within them.  As of May 25, 2020, the DOC reported 396 confirmed cases among inmates.  The vast majority of these cases were found in three institutions:  the Massachusetts Correctional Institution (MCI)-Shirley (160 cases) and MCI-Framingham (84 cases); and the Massachusetts Treatment Center (MTC) (130 cases).  Five other institutions had at least one case among the incarcerated, and the rest reported zero confirmed cases.  The data do not reveal how many of these individuals are actively symptomatic or how many have recovered from the disease.  Eight incarcerated individuals have died of COVID-19.

Staff at a number of correctional institutions also have

tested positive for the virus.[10]  As of May 25, 2020, 182 DOC staff, across eleven DOC facilities, had confirmed cases of COVID-19.  While MCI-Shirley, the MTC, and MCI-Framingham again had the highest numbers of positive tests, the distribution of infections amongst staff is broader than that of the inmates.  As we noted in CPCS v. Trial Court, 484 Mass. at 437, infections among staff are of particular concern.  They not only risk bringing the virus into prisons, thereby spreading it amongst a closely confined, captive, and especially vulnerable population, but they also risk spreading the virus from prisons into the broader community.  Id.  As with inmates, the data do not reveal how many staff are currently symptomatic or recovered.  Currently, no correctional staff have died of COVID-19.

As part of ascertaining how crowded these facilities are, the parties ask us to compare the total number of prisoners to dueling definitions of prison capacity:  operational capacity or design capacity.  Operational capacity is based on guidelines issued by the Association of State Correctional Administrators.  CPCS v. Trial Court, 484 Mass. at 439 n.12.  Design capacity refers to "[t]he number of inmates that planners or architects intended for the institution," as revised by a rating official

---

[10] In discussing staff, we include both those employed directly by the DOC and also vendors and subcontractors who work within correctional institutions.

from within the DOC.  See Governor, Quarterly Report on the Status of Prison Capacity, Fourth Quarter 2019, 10 (Apr. 2020) (defining design capacity).  In every facility in Massachusetts, the operational capacity is higher than the design capacity, sometimes significantly so.  In the most pronounced example, the North Central Correctional Institution at Gardner (NCCI-Gardner) has a design capacity of 568 inmates, but an operational capacity of 974 inmates.

The metric matters.  As of May 25, 2020, no DOC facility was over its operational capacity, and five were operating at less than fifty percent of operational capacity.[11]  The DOC system as a whole was at approximately sixty-five percent of operational capacity (6,639 prisoners out of a total operational capacity of 10,209).  By contrast, five institutions were over their design capacities, including NCCI-Gardner (medium security), which was at 160 percent of its design capacity.  In aggregate, the DOC was operating at approximately eighty-nine percent of its design capacity (6,639 prisoners and design capacity of 7,492).

---

[11] The three institutions at which there have been the most significant COVID-19 outbreaks do not stand out as notably crowded.  The MTC is at 80% of operational capacity and 94% of design capacity; MCI-Shirley (medium security) is at 81% of operational capacity and 121% of design capacity; and MCI-Framingham is at 20% of operational capacity and 26% of design capacity.

2.  Efforts at containment in correctional institutions.
This court and all parties agree that correctional institutions
face unique difficulties in keeping their populations safe
during this pandemic.  Because the constitutional adequacy of
the DOC's measures to control the spread of COVID-19 in its
facilities is central to this litigation, we review them at some
length.

a.  Policy directives.  When the Governor declared a state
of emergency on March 10, 2020, the DOC began implementing its
COVID-19 control plans.  Beginning on March 12, 2020, the
commissioner delivered a series of directives, memoranda, and
advisories to both inmates and staff.  These essentially weekly
communications document escalating and responsive efforts to
implement guidance from the Centers for Disease Control (CDC)
and the Department of Public Health (DPH).  The interim guidance
by the CDC itself recognizes that full compliance with best
practices is not feasible in all facilities; therefore, the
commissioner has required each facility in Massachusetts to
create its own compliance plan.  See Interim Guidance on
Management of Coronavirus Disease 2019 (COVID-19) in
Correctional and Detention Facilities (Mar. 23, 2020) (Interim
Guidance), https://www.cdc.gov/coronavirus/2019-
ncov/downloads/guidance-correctional-detention.pdf
[https://perma.cc/MXY3-ETDL].

For example, the first memoranda issued guidance concerning proper hand-washing technique, sanitation, and questions used to screen potentially symptomatic staff and inmates. The advisory issued on March 20, 2020, limited transports between facilities, authorized staff to wear personal protective equipment (PPE) in high-risk parts of facilities, and upgraded cleaning and disinfection protocols. One week later, the guidance required staff to wear masks, provided PPE to certain inmates in especially high-risk areas, and allowed alcohol-based hand sanitizer, something that previously had been discouraged in prison settings. On April 3, 2020, the commissioner initiated a system-wide lockdown. Since then, inmates who live in cells have been spending twenty-three hours per day in their cells, while inmates living in dormitory-style housing have been unable to leave their units.

While the plaintiffs contest whether these various directives are sufficient ultimately to ensure inmate safety, it is difficult to dispute that they show ongoing attention -- at least at the level of planning and policy -- both to guidance from the CDC and DPH and to the evolving situation on the ground. Nonetheless, as the boxer Mike Tyson once said, "Everyone has a plan until they get hit." That is to say, even the most meticulous and exceptional planning by the DOC still might not meet constitutional muster if there are pervasive

failures in implementation.  We therefore examine the execution of these plans and procedures.

b.  Physical distancing.  Physical distancing between individuals (so-called "social distancing") has been a cornerstone of the public health response to COVID-19, both in the United States and around the world.  See generally Interim Guidance, supra.  The CDC defines social distancing as "the practice of increasing the space between individuals and decreasing the frequency of contact to reduce the risk of spreading a disease (ideally to maintain at least [six] feet between all individuals, even those who are asymptomatic)."  Id. at 4.  By following these practices, the goal is to slow the rate at which the disease progresses through the population.

Since the first case of COVID-19 was detected in a DOC facility, the DOC has taken steps to implement physical distancing within all of its facilities.  Initially it banned contact sports, and later banned all use of gyms, weights, and prison yards.  Some inmate beds were moved further apart, and, in accordance with CDC guidance, inmates were asked to sleep head to foot, so as to increase the distance between their faces.  Meals now are served in cells or dormitories to avoid congregation in dining areas.  Staff have attempted, apparently at times unsuccessfully, to reduce or eliminate medication lines.

Certain aspects of prison design limit the degree to which physical distancing is possible. Due both to the fact that some single cells have been reserved for quarantining inmates and because of the underlying building designs, currently fifty-eight percent of inmates sleep either in a two-person cell or in a dormitory-style room. Since the lockdown, these inmates sleep and live within six feet of at least one other inmate, and sometimes many more. Approximately seventy percent of prisoners eat within six feet of another prisoner.

For example, plaintiff Michael White resides in a dormitory-style room at MCI-Concord that contains bunkbeds for approximately eighty inmates. The beds are three feet apart, the sinks are one foot apart, and White generally eats within arm's reach of at least one other inmate. White's account of attempting to maintain appropriate distance in a dormitory setting is consistent with accounts by plaintiffs Ryan Duntin and Dana Durfee. Moreover, while the occupants of a dormitory may be siloed from other groups of inmates in the prison (something the DOC calls "cohorting"), if an asymptomatic guard or other staff member were to introduce the virus, this type of "cohorting" would be ineffective to prevent the spread of COVID-19 to those housed in the unit.

The DOC argues that, even if those in double cells are unable to maintain physical distance from their cellmates, the

conditions are consistent with physical distancing guidance provided by the CDC because each pair of cellmates is analogous to a family unit in the broader community -- not distanced from one another, but from every other set of cellmates.  This argument has merit as far as it goes, but runs up against basic aspects of prison design:  those housed in double and single cells still often must share showers, toilets, sinks, and telephones with those in other cells on their tier or in their block.  Inmate testimony credited by the Superior Court judge consistently reported a lack of physical distancing with those in other cells while individuals use these essential fixtures or await their turn to do so.

c. Facility sanitation and personal protective equipment. The DPH is statutorily required to conduct biannual inspections of DOC facilities for compliance with health and sanitation regulations and to report on its findings and recommendations. See G. L. c. 111, § 20; 105 Code Mass. Regs. §§ 451.401 et seq. The plaintiffs draw our attention to recent reports for each DOC facility showing that health code violations for most facilities number in the hundreds.  The plaintiffs emphasize violations of regulations that recommend a specific amount of floor space per prisoner, and point out that twelve DOC facilities house at least some inmates in cells that do not meet the DPH recommended standards.  These violations are concerning generally, and all

the more so under conditions of global pandemic.

We note, however, that the mere number of violations only paints a partial picture. It does not distinguish between mandatory regulations (105 Code Mass. Regs. §§ 451.100, 451.200) and recommended standards (105 Code Mass. Regs. §§ 451.300). Furthermore, the violations vary significantly in severity. At MCI-Framingham, for example, violations range from a paper towel dispenser that was not stocked at the time of inspection and a dusty wall fan to evidence of a "chronic rodent and insect issue in the food service areas." Counting the number of violations alone does not capture this distinction. Some chipped paint has little bearing on our analysis here; bathroom and shower areas at the MTC that were so poorly maintained as to yield an "increased risk of disease transmission" are highly germane.

In March 2020, the DOC began ordering large amounts of PPE and cleaning supplies. Cleaning regimens at all DOC facilities have been enhanced, and disinfectant cleaning supplies have been made available to inmates so that they may clean their own cells. As stated, the DOC also has begun to allow alcohol-based hand sanitizer, which it has distributed widely across its facilities. Despite these efforts, both cleaning supplies and hand sanitizer periodically have run short. The precise extent of these shortages varies by institution and remains the subject of some factual dispute.

While initially PPE was provided only to correctional staff in specific, high-risk areas, its use has expanded as the pandemic has progressed. Since March, staff have been required to wear masks at all times within the facilities. Between April 24, 2020, and April 28, 2020, the DOC distributed surgical masks to all inmates. Not all staff have complied entirely with PPE mandates; likewise, some inmates have not followed the DOC's "strong encouragement" to wear the masks provided. Supervising officers have used video surveillance records to discipline officers who have failed to comply with PPE requirements, including one officer who was suspended for five days when he and all of his staff were found not to be wearing masks.

d. Entrance screenings and quarantines. To prevent the introduction of the virus into its facilities, the DOC has limited access to prisons; it has allowed only staff and attorneys to enter, and has prohibited visitors and volunteers. Each facility screens all those who seek entry according to protocols developed with reference to the guidance issued by the CDC and DPH. These protocols involve a questionnaire and self-administered temperature check; those with temperatures over 99.9 degrees Fahrenheit categorically are denied admittance. The effectiveness of these screenings are limited by the fact that, as all parties agree, asymptomatic individuals can spread the disease.

In every facility, the DOC has set aside areas to isolate and quarantine confirmed and suspected cases of COVID-19, as well as inmates who have refused to be tested. Individuals entering DOC custody are quarantined for two weeks. As of May 1, 2020, there were "many open cells in the quarantine unit[s]" available should COVID-19 cases spike. Inmates who believe they are at heightened risk proactively may request isolation (being held in a single cell), subject to a medical evaluation, but there is not enough space to place all inmates at heightened risk, which would amount to one-half of the DOC population, in single cells. Moreover, both the commissioner and the plaintiffs share a concern for the mental health implications of long-term single-cell isolation.

e. Testing. The DOC's testing strategy has evolved as the pandemic has progressed. The DOC conducted its first COVID-19 test on March 19, 2020, when an inmate at the MTC presented with symptoms. DOC reports that initially it followed CDC and DPH guidelines by deferring to the medical judgment of the medical providers at each facility as to the testing needed. This generally involved testing inmates who were symptomatic or who had been in close contact with someone who tested positive.

On April 22, 2020, large-scale mobile testing became available to the DOC, and it began administering tests to any inmate or patient who voluntarily agreed to be tested, facility

by facility.  As of May 25, 2020, the DOC had offered tests to all inmates or patients at thirteen facilities.  According to the schedule it submitted in its Mass. R. A. P. 16 (l) letter, all inmates will be offered an initial test by the end of May.  Any staff member may receive a test at any time upon request.

f.  Decreasing population.  The plaintiffs seek an order requiring the defendants to reduce the population of incarcerated persons until no prisoner is housed in a correctional facility where the population exceeds the design capacity of the institution or until no inmate is housed in a cell that does not meet the DPH-recommended floor space regulations.  It is unclear how many individuals would be required to be released in order to meet these criteria.  At the evidentiary hearing, the commissioner agreed that decreasing the inmate population at DOC facilities could help contain the spread of COVID-19, and that measures to do so should be taken, so long as they are lawful and appropriate in light of the over-all health and safety of the public.

The commissioner has several tools at her disposal to reduce the population in DOC custody, including medical parole, good time credit, and furloughs.  The Superior Court judge found that the DOC has taken multiple steps to expedite the medical parole process, including shortening internal deadlines, reviewing home plans earlier in the process, and notifying

MassHealth so that the inmate has medical insurance upon release. Since our decision in CPCS v. Trial Court, 484 Mass. at 435-436, 456-457 (Appendix B), twenty-six individuals have been approved for medical parole; it remains unclear how many of those individuals actually have been released.[12]

Pandemic lockdown conditions effectively can lengthen sentences by limiting the opportunities by which inmates ordinarily would be able to earn good-conduct sentence deductions, or "good time credit." See G. L. c. 127, § 129D. The statute permits 7.5 days of good time credit per activity, and fifteen days total per month. See id. In response to the pandemic, the commissioner awarded full good time credit for the month of March 2020 for anyone who had been earning such credit on March 1. She also established a journaling program by which inmates can earn 7.5 days of good time credit for the month of April. Therefore, in April, inmates were eligible for one-half the good time credits they ordinarily would have been able to obtain. The commissioner indicated in her testimony that she was considering expanding these opportunities in May; the record does not indicate whether she has done so.

The DOC has not used furloughs since the 1990s, based on a belief that it is "bad policy" to release an inmate who later

---

[12] See Robert Malloy & another vs. Department of Correction, SJC No. 12961.

must be reincarcerated.  Accordingly, the DOC has not furloughed any inmates during the pandemic.

The commissioner does not believe that she has statutory authority to allow inmates to serve any portion of their State prison sentence under home confinement.  We do not agree.  See G. L. c. 127, §§ 48, 49, 49A; Commonwealth v. Donohue, 452 Mass. 256, 265 (2008); discussion part 6, infra.

3.  Plaintiffs committed for substance abuse treatment. Under G. L. c. 123, § 35, Massachusetts courts are authorized to commit an individual for involuntary substance use disorder treatment upon a finding that the individual has a substance use disorder and that the disorder poses a likelihood of serious harm.  See Matter of G.P., 473 Mass. 112, 120 (2015).

Generally, committed individuals are sent to unsecured treatment facilities licensed by the DPH or the Department of Mental Health.  See G. L. c. 123, § 35.  If DPH informs the judge issuing the commitment that no such facilities are available, or "if the court makes a specific finding that the only appropriate setting for treatment for the person is a secure facility," the judge may commit the individual to a secure facility designated by the commissioner.  Id.  Currently, there are three secure facilities in the Commonwealth.  The DOC operates the Massachusetts Alcohol and Substance Abuse Center (MASAC), which is located at the MCI-Plymouth prison.  The

Hampden County sheriff, under an agreement with the DOC, operates the Stonybrook Stabilization and Treatment Centers at Ludlow and Springfield, both of which are located at the Hampden County Correctional Center.

a. General precautions. Both the DOC and the Hampden County sheriff's office have taken steps to protect their patients from COVID-19. All persons entering their facilities are screened for symptoms of COVID-19 and are held in a medical quarantine unit for fourteen days. Staff members are required to wear masks; for certain activities, they also wear gloves. The degree of compliance with these requirements remains in dispute. A declarant and an affiant for the plaintiffs state that masks and gloves are not consistently used or changed between uses at MASAC. All patients have been given masks and soap. MASAC does not provide soap in the bathrooms, so patients must bring their personal soap with them. At MASAC, a private vendor cleans and sanitizes the facility daily, including within patient rooms. Between March 13 and April 23, 2020, the MASAC population declined by eighty-two percent, and the Stonybrook population declined by fifty-seven percent. As of May 25, 2020, MASAC held forty-three patients. This amounts to twenty-nine percent of its design capacity and seventeen percent of its operational capacity. Due to the low censuses, all patients have been given single occupancy rooms. On May 23, 2020, MASAC

reported that two patients tested positive for COVID-19. One MASAC staff member had also previously tested positive.

b. <u>Treatment</u>. The parties offer divergent accounts of the degree to which treatment has been interrupted by the pandemic; the Superior Court judge did not make findings discrediting any of these differing reports. Plaintiff Mark Santos was committed to MASAC on March 4, 2020. He avers that because MASAC went into a lockdown on April 3, 2020, he was required to remain in his cell, and could leave only to go to the restroom, make a telephone call, or receive medication. Santos states that most treatment classes were canceled in mid-March, and he attended only one daily group session before the lockdown. The lockdown was still in effect when he was released on April 9, and Santos avers that he received no treatment during the lockdown. The DOC concedes that it instituted a lockdown at MASAC in order to make COVID-19 response plans, but maintains that the lockdown lasted only three days.

Declarant Robert Peacock was committed to MASAC on April 24, 2020, and executed his declaration on April 28, 2020. He stated that he had been locked in his cell continuously since being committed, and could leave only to shower. He said as well that he had received no counselling or any other type of

treatment since his arrival.[13]

The DOC asserts that, for the first three days of their fourteen-day intake, patients are restricted to an observation room and assessed daily by clinical staff.  After three days, patients who have been "detox cleared" are moved out of the observation room but remain in the separate unit.  For the remainder of the fourteen-day period, patients receive "individual services" from a substance use disorder counsellor.  Thereafter, MASAC patients are moved to the general treatment unit, where they attend group sessions and other programming.

The Hampden County sheriff's office reports that new patients are provided substance abuse treatment while in their initial fourteen-day quarantine, and that, due to the lower population, patients currently receive more programing overall than they would have prior to the pandemic.

Discussion.  1.  Standard of review.  "A party seeking a preliminary injunction must show that success is likely on the merits; irreparable harm will result from denial of the injunction; and the risk of irreparable harm to the moving party

---

[13] The DOC maintains that Robert Peacock initially exhibited signs of withdrawal and confusion, and therefore was kept in an observation room until April 28, 2020, when he was "detox cleared."  The DOC asserts that, on April 29, 2020, he met with a substance abuse counsellor, who described the program, explained the expectations of patients, and gave him some written treatment materials.

outweighs any similar risk of harm to the opposing party" (quotation and citations omitted). Doe v. Worcester Pub. Sch., 484 Mass. 598, 601 (2010). "In cases in which a public entity is a party, a judge may also weigh the risk of harm to the public interest in considering whether to grant a preliminary injunction" (citations omitted). Id. See Fordyce v. Hanover, 457 Mass. 248, 255 n.10 (2010); Packaging Indus. Group, Inc., 380 Mass. at 616-617. "[T]he movant's likelihood of success is the touchstone of the preliminary injunction inquiry. [I]f the moving party cannot demonstrate that he is likely to succeed in his quest, the remaining factors become matters of idle curiosity." (Quotations and citations omitted.) Maine Educ. Ass'n Benefits Trust v. Cioppa, 695 F.3d 145, 152 (1st Cir. 2012).

2. Class certification. In their complaint and in their motion for injunctive relief, the plaintiffs purport to represent one over-all class of individuals that also is made up of two smaller subclasses. They seek class certification for all classes. The broad injunctive relief sought by the plaintiffs is possible only if there is a class that may be certified. Thus, in order to determine whether their class claims have a reasonable likelihood of success, a prerequisite for granting a preliminary injunction, we first must determine whether the requested classes may be certified.

Under Mass. R. Civ. P. 23 (a), as amended, 471 Mass. 1491 (2015), members of a class may represent the class "only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class."  Additionally, the court must conclude that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy."  Mass. R. Civ. P. 23 (b).  The plaintiffs bear the burden of providing "information sufficient to enable the motion judge to form a reasonable judgment that the class meets the requirements of rule 23" (quotation and citation omitted).  Gammella v. P.F. Chang's China Bistro, Inc., 482 Mass. 1, 12 (2019).

While the precise contours of the global class that the plaintiffs ask us to certify remain somewhat unclear, they are clear as two specific putative subclasses:  medically vulnerable individuals who are at high risk for serious complications or death from COVID-19 due to their underlying medical conditions or age, and those being held for treatment pursuant to G. L.

c. 123, § 35.

We conclude that the plaintiffs have shown a substantial likelihood that a class of medically vulnerable inmates who are currently serving criminal sentences, or who will begin serving such sentences in the future, can be certified. According to the commissioner, nearly one-half of the DOC population is potentially at heightened risk of a serious course of the disease, leaving little question of numerosity. While there may be some variance between facilities, the legal claim and its basic factual underpinning are common to all potential class members: that the increased risk of contracting COVID-19 caused by the current conditions of the correctional facilities, in concert with the individuals' medical vulnerability, constitutes cruel and unusual punishment. Because this is precisely the claim of several of the named class members, they appear to be sufficiently typical and to have a substantial basis to show that they adequately and fairly can represent the class.

Although the plaintiffs have shown that they are not precluded from establishing a substantial likelihood of success on the merits in at least one of their requests for class certification, we do not have an adequate basis in this record to ascertain the proper contours of who qualifies as medically vulnerable. Nor, on this record, can we determine whether there is adequate commonality in the named plaintiffs and the

superclass of all incarcerated individuals the plaintiffs also seek to represent. While we understand the pressing urgency of this litigation, the Superior Court judge is better positioned to take expert testimony and to determine the appropriate definition of medically vulnerable individuals for purposes of this litigation. See Weld v. Glaxo Wellcome Inc., 434 Mass. 81, 87 n.8 (2001), citing Carpenter v. Suffolk Franklin Sav. Bank, 370 Mass. 314, 317-318 (1976) (unlike its Federal counterpart, rule 23 of Massachusetts Rules of Civil Procedure does not mandate early ruling on class certification).

The second subclass that the plaintiffs seek to represent, those being held under G. L. c. 123, § 35, presents an entirely different issue. As the defendants point out, Mark Santos, the proposed representative of this class, was released eight days before the filing of the complaint. He makes no claim that he is likely to be committed again. Thus, he would not be able to bring this claim on his own behalf because injunctive relief, preliminary or otherwise, would not redress his asserted injury.[14] See Los Angeles v. Lyons, 461 U.S. 95, 102 (1983); LightLab Imaging, Inc. v. Axsun Techs., Inc., 469 Mass. 181, 194

---

[14] Our holding in Matter of a Minor, 484 Mass. 295, 299-300 (2020), that the minor's release from commitment did not render his appeal moot, is inapposite. Santos does not appeal from the initial commitment decision. Cf. id. Rather, he argues, on behalf of the class, that the conditions of confinement during the pandemic render continued confinement unconstitutional.

(2014). Because he could not bring an action on his own behalf, Santos cannot represent the purported class.[15] See <u>Doe</u> v. <u>Governor</u>, 381 Mass. 702, 704-705 (1980).

The plaintiffs' ability to locate a substitute class member seems virtually certain. Indeed, even this limited record contains an affidavit from Peacock, who was relatively newly committed when the complaint was filed, setting forth his concerns about lack of programming, the close to twenty-four hours per day he was held in his room, proximity to others when using certain necessary facilities, and cleanliness of shared surfaces.

If, as appears virtually certain, the plaintiffs are able to obtain a suitable representative whose claims are typical of the class, we anticipate that they will succeed in meeting the certification requirements. Multiple questions of law and fact

---

[15] Any anticipated future mootness of the class representative's individual claims should not preclude class certification, where the "claims are so inherently transitory that the trial court will not have even enough time to rule on a motion for class certification before the proposed representative's individual interest expires" (citation omitted). See <u>County of Riverside</u> v. <u>McLaughlin</u>, 500 U.S. 44, 52 (1991), and cases cited. See also <u>Gammella</u> v. <u>P.F. Chang's China Bistro, Inc.</u>, 482 Mass. 1, 20 n.24 (2019); <u>Gonzalez</u> v. <u>Commissioner of Correction</u>, 407 Mass. 448, 452 (1990). Thus, had Santos been committed when the complaint was filed, his subsequent release would not have prevented the class from being certified or Santos from continuing to represent it. Here, however, the issue is not mootness; rather, Santos lacked standing from the start. See <u>County of Riverside</u>, <u>supra</u> at 51 (distinguishing mootness from lack of standing).

are common to all putative class members, including issues regarding conditions of treatment and the risk of transmission in these conjugate settings. Based on the broad nature of the plaintiffs' arguments, the issues in common apparently predominate over those they may not share. The numerosity requirement almost certainly will be met because dozens of class members likely exist, and new commitments are ongoing, rendering joinder of all members impracticable. See Gammella, 482 Mass. at 11-12 & n.15. Lastly, adequacy exists due to the apparent lack of conflict between class members, and class counsel's ability vigorously to pursue the action. See In re Hyundai & Kia Fuel Economy Litigation, 926 F.3d 539, 566 (9th Cir. 2019).

Thus, we defer the issue of certification to allow the plaintiffs to locate and substitute an appropriate representative. See Gonzalez v. Commissioner of Correction, 407 Mass. 448, 451-453 (1990) (holding that named plaintiff's claims were moot, denying defendant's motion to dismiss, and remanding matter to Superior Court with instructions to dismiss in set period of time if substitute plaintiff could not be found). See also Mass. R. Civ. P. 15 (a), 365 Mass. 761 (1974) (party may amend pleading "by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires").

Despite the open questions of class certification that we

remand for resolution in the Superior Court, we address the merits of the preliminary injunction, which has been briefed and argued before us.  See O'Sullivan v. Secretary of Human Servs., 402 Mass. 190, 192 (1988) (reaching merits of case, despite mootness of named plaintiffs, because defendants did not argue mootness and because counsel "apparently [were] prepared to pursue this action on behalf of [a substitute plaintiff]"); Massachusetts Gen. Hosp. v. Rate Setting Comm'n, 371 Mass. 705, 713 (1977) (no error where court ruled on merits of case without ruling on class certification); Gooch v. Life Investors Ins. Co. of Am., 672 F.3d 402, 432-433 (6th Cir. 2012) (no error where court ruled on preliminary injunction before class certification).  The urgency of the claims raised convinces us that delaying resolution of the motion would do an injustice.

3.  Constitutional claims.  While the plaintiffs' briefs do not make this distinction entirely clear, because only inmates who have been convicted and are serving a sentence are subject to punishment by the Commonwealth, the Eighth Amendment claims are applicable only to this group.  Any relief sought by civilly committed individuals must be sought on the grounds of a violation of substantive due process rights; because they are not being punished, the Eighth Amendment's protections against cruel and unusual punishment do not apply.  See Youngberg v. Romeo, 457 U.S. 307, 315-316 (1982).

We consider first the claims of the incarcerated individuals.

a. Eighth Amendment claims. The plaintiffs contend that their conditions of confinement, and the defendants' failure to expedite the release of a greater number of individuals from incarceration, using any of a number of mechanisms, violate their rights under the Eighth and Fourteenth Amendments and arts. 1, 10, 12, and 26.

Because we have not held that art. 26 provides greater protections with respect to conditions of confinement than does the Eighth Amendment, and conditions for the civilly committed must be at least as good as for those who are serving sentences of incarceration, see Youngberg, 457 U.S. at 321-322, we consider first the plaintiffs' likelihood of success under the Eighth Amendment.

"The Eighth Amendment . . . prohibits any punishment which violates civilized standards and concepts of humanity and decency." Young v. Quinlan, 960 F.2d 351, 359 (3d Cir. 1992). As the plaintiffs observe, the Eighth Amendment applies to conditions of confinement that are separate from and independent of any condition imposed as a part of sentencing. See Helling, 509 U.S. at 32-33.

> "[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for

> his safety and general well being. . . . The rationale for this principle is simple enough: when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs -- e.g., food, clothing, shelter, medical care, and reasonable safety -- it transgresses the substantive limits on state action set by the Eighth Amendment . . . ." (Quotation and citation omitted.)

Id. at 32.

In order to establish an unconstitutional condition of confinement, a claimant must show both an objective element and a subjective element. Wilson v. Seiter, 501 U.S. 294, 298 (1991). The objective element requires an inmate to show that his or her living conditions amount to a "serious deprivation[] of basic human needs," Rhodes v. Chapman, 452 U.S. 337, 347 (1981), which can include denial of medical care for serious medical needs, Estelle, 429 U.S. at 102-105.

The subjective element requires an inmate to demonstrate that prison officials acted or failed to act with deliberate indifference. Id. at 106. See Torres, 427 Mass. at 614. "[A] prison official cannot be found liable under the Eighth Amendment for denying an inmate humane conditions of confinement unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the inference." Farmer v. Brennan, 511 U.S. 825, 837 (1994). While

subjective knowledge is a question of fact that a claimant must establish, and it is necessary to distinguish between obvious risks and a prison official's actual knowledge of the risk, where the risk is so obvious that a reasonable person would realize it, "a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious."  Id. at 842.

b.  Risk of contracting COVID-19 in the Commonwealth's prisons.  As stated, an inmate asserting unconstitutional conditions of confinement first must establish, objectively, that the conditions pose a "substantial risk of serious harm." See Farmer, 511 U.S. at 834, citing Helling, 509 U.S. at 35. See also Rhodes, 452 U.S. at 347 (Eighth Amendment violation requires showing that living conditions amount to "serious deprivation of basic human needs," including denial of medical care for serious medical needs).

The defendants contend that the incarcerated plaintiffs will be unable to establish the objective component of their deliberate indifference claim; they argue,

> "No prisoner has been forced to endure an extreme
> deprivation or even an unreasonable risk to their health or
> safety.  The measures mentioned above, such as increased
> cleaning and sanitizing operations, distribution of PPE to
> all inmates and staff, posting of educational and
> institutional flyers and memoranda, and encouraging social
> distancing as much as possible, rival that which is being
> done in the community to help combat the spread of an
> insidious disease that all Americans, inmate or not, are at

risk of contracting."

We do not agree.  Notwithstanding the claim that no inmate has had to endure an unreasonable risk to health or safety as a result of being incarcerated during the COVID-19 pandemic, there can be no real dispute that the increased risk of contracting COVID-19 in prisons, where physical distancing may be infeasible to maintain, has been recognized by the CDC and by courts across the country.[16]  See, e.g., Baez vs. Moniz, U.S. Dist. Ct., No. 20-10753-LTS (D. Mass. May 18, 2020) ("There is, and can be, no meaningful dispute that COVID-19 presents a substantial risk of serious harm to health, to the proposed class of petitioners in this case as well as to members of society at large"); Refunjol vs. Adducci, U.S. Dist. Ct., No. 2:20-cv-2099 (S.D. Ohio May 14, 2020) ("The objective component of the inquiry is beyond debate. Nobody can dispute that COVID-19 is a sufficiently serious medical need . . . ."); Frazier vs. Kelley, U.S. Dist. Ct., No. 4:20-cv-00434-KGB (E.D. Ark. May 4, 2020) ("[I]t cannot be disputed that COVID-19 poses an objectively serious health risk

---

[16] That the CDC interim guidance for prisons recognizes that in some instances it may not be feasible to maintain the recommended six feet, and offers other guidance that may help to reduce the risk as far as possible in such circumstances, does not mean, as the defendants appear to suggest, that the CDC recommends maintaining a lesser distance among incarcerated individuals than among others; it clearly states repeatedly that six feet or more "ideally" should be maintained between incarcerated individuals, including in housing arrangements. See Interim Guidance, supra at 3, 4, 11, 13, 19, 20.

to named plaintiffs and the putative classes given the nature of the disease and the congregate living environment of the . . . facilities").

Having concluded that the incarcerated plaintiffs almost certainly will succeed in establishing the objective component of their claims under the Eighth Amendment, we turn to consideration of the subjective component, i.e., whether the plaintiffs are likely to be able to establish deliberate indifference on the part of the defendants.

4. Deliberate indifference. a. Applicable standard. "While Estelle[, 429 U.S. at 105-106,] establishes that deliberate indifference entails something more than mere negligence, the cases are also clear that it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Farmer, 511 U.S. at 835. "With deliberate indifference lying somewhere between the poles of negligence on the one end and purpose or knowledge at the other," courts frequently have described it as "recklessly disregarding" a substantial risk of harm. Id. at 836, and cases cited. In other words, the subjective standard for deliberate indifference requires the same showing of "subjective recklessness" as would apply in the criminal context. Id. at 839-840.

This is not a static determination. In a suit for

prospective relief, "the subjective factor, deliberate indifference, should be determined in light of the prison authorities' current attitudes and conduct," including "their attitudes and conduct at the time suit is brought and persisting thereafter."  Farmer, 511 U.S. at 845, quoting Helling, 509 U.S. at 36.  In making the requisite showing of subjective culpability, the prisoner may rely "on developments that postdate the pleadings and pretrial motions, as [prison officials] may rely on such developments to show that the [prisoner] is not entitled to an injunction."  Farmer, supra at 846.

b.  Analysis.[17]  Following the United States Supreme Court's reasoning in Estelle, 429 U.S. at 106, and Helling, 509 U.S. at 32-33, concerning prison officials' Eighth Amendment duty to take reasonable steps to protect inmates from the spread of serious communicable diseases, inmates across the country have

---

[17] The plaintiffs urge that, rather than the objective and subjective components of deliberate indifference, this court apply the objective standard used in Kingsley v. Hendrickson, 135 S. Ct. 2466, 2473 (2015), in evaluating their Eighth Amendment claims.  This reasoning is misguided.  Kingsley involved a claim by a pretrial detainee under 42 U.S.C. § 1983, concerning the use of excessive force.  The detainee asserted a violation of his substantive due process rights.  Accordingly, to prevail, he was required to show only that the intentional use of force was excessive or objectively unreasonable, and not that the official intended it to be so.  This standard, however, is inapplicable to claims of deliberate indifference under the Eighth Amendment.

brought a variety of actions successfully challenging the policies, or lack of policies, of prison officials regarding the spread of contagious diseases and other conditions that threaten health throughout a prison. In Lareau v. Manson, 651 F.2d 96, 109 (2d Cir. 1981), for example, the United States Court of Appeals for the Second Circuit applied this line of reasoning to hold prison officials liable for violating the Eighth Amendment when they made no efforts to screen incoming inmates for contagious diseases, despite significant overcrowding that further heightened the risk of infection. The court held that aggrieved prisoners need not demonstrate that "an infectious disease has actually spread in an overcrowded jail before issuing a remedy." Id. See, e.g., DeGidio v. Pung, 920 F.2d 525, 533 (8th Cir. 1990) (prison officials were deliberately indifferent to inmates' serious medical needs by consistent pattern of reckless or negligent conduct in failing to prevent and control prison's tuberculosis epidemic); Dunn v. White, 880 F.2d 1188, 1195 (10th Cir. 1989), cert. denied, 493 U.S. 1059 (1990) (observing that prison's failure to protect incarcerated inmates from human immunodeficiency virus [HIV] infection may violate Eighth Amendment); Smith v. Sullivan, 553 F.2d 373, 380 (5th Cir. 1977) (concluding that housing scabies- and gonorrhea-infected inmates with healthy prisoners violates Eighth Amendment).

Where the risk of serious harm is substantial, but prison officials have undertaken significant steps to try to reduce the harm and protect inmates, courts have concluded that there was no Eighth Amendment liability.[18]  In Butler v. Fletcher, 465 F.3d 340, 345 (8th Cir. 2006), cert. denied, 550 U.S. 917 (2007), for example, the United States Court of Appeals for the Eighth Circuit determined that the sheriff in charge of a county jail was not deliberately indifferent to the risk of a tuberculosis infection within the jail where the county adopted "policies [that] specifically acknowledged the risk and promulgated detailed procedures for the diagnosis, segregation, and treatment of . . . inmates infected with active cases of [tuberculosis]."  See Johnson v. United States, 816 F. Supp. 1519, 1522-1525 (N.D. Ala. 1993) (applying reasoning in Lareau, 651 F.2d at 109, and concluding that inmate did not establish violation of Eighth Amendment from being housed in cell with patient who was dying from acquired immune deficiency syndrome, where prison officials' policies educated inmates on "universal precautions" and prohibited type of high risk behavior that

_____

[18] Courts have relied on similar reasoning in considering prison officials' policies with respect to other widespread risks to health and safety.  See, e.g., Rish v. Johnson, 131 F.3d 1092, 1099 (4th Cir. 1997) (requiring inmates to clean up blood and bodily fluids without providing them gloves); Wallis v. Baldwin, 70 F.3d 1074, 1077 (9th Cir. 1995) (requiring inmate to clean attic full of asbestos, known carcinogen, without protective equipment).

could result in HIV infection).

While there are as yet no appellate court decisions on claims asserting a violation of the Eighth Amendment due to the increased risk of exposure to COVID-19 in prisons, a number of Federal District Courts have considered the issue using a similar analysis.  For example, in Baez, No. 20-10753-LTS, the United States District Court for the District of Massachusetts concluded that the inmate-petitioners had not established a likelihood of success on the merits.  Given prison officials' "many measures and policies aimed at keeping COVID-19 from entering the facility," and the "meaningful actions" undertaken "aimed at controlling and mitigating against the spread of COVID-19 within the facility," the plaintiffs were unlikely to show that prison officials had been "obdurate, wonton, or reckless with respect to [the risk of COVID-19], or . . . otherwise failed to take reasonable steps aimed at preventing or mitigating the risk that COVID-19 presents to those detained." Id.  In Kevin M.A. vs. Decker, U.S. Dist. Ct., No. 20-4593 (KM) (D.N.J. May 1, 2020), the United States District Court for the District of New Jersey concluded that, due to the "numerous affirmative steps to try and stop the spread of COVID-19" taken by jail officials, and the "protocols for individuals who exhibit symptoms," the inmate-petitioner had failed to demonstrate deliberate indifference, notwithstanding that he

became ill with COVID-19 while in custody.

To combat the spread of COVID-19 as far as possible, the DOC has undertaken a number of measures, set forth in the appointed judge's findings of fact, many of which are stipulated to by the parties. These measures included lockdowns of the facilities; prohibiting all outside visitors; restrictions and self-examination on entry to any facility; isolation of symptomatic inmates and those who have tested positive; requiring staff to stay home for fourteen days if they have any symptoms; mandating that staff wear masks when in contact with inmates; distribution of additional cleaning supplies to all inmates; increased cleaning of frequently touched surfaces; making alcohol-based hand sanitizer available to inmates in numerous facilities; having inmates eat in their cells or housing units rather than at tables in larger groups; and instructions, posters, and information on COVID-19 and its spread, in both Spanish and English. To reduce inmates congregating in close contact with each other, the DOC has eliminated most group programming, work release, and academic and job skills classes, as well as outdoor recreation time and access to gyms and libraries, i.e., any activities where groups of inmates would be together.

Over the course of this litigation, the DOC has obtained and distributed PPE to staff and, recently, all inmates. It has

required that staff in contact with inmates, and all inmates who leave their cells or dormitories, wear masks at all times. The DOC also recently has instituted some limited amount of outdoor time for all inmates, in small groups approximately every four days, so that physical distancing can be maintained.

In evaluating whether deliberate indifference has been established, courts often have examined guidelines and standards from professional associations and State codes. "Published standards of medical care or adopted guidelines such as the tuberculosis manuals . . . do not establish absolute standards for measuring the constitutionality of official actions. But neither may they be ignored by [S]tate officials, however. Such standards and guidelines are useful measures for 'determining whether contemporary standards of decency have been met.'" DeGidio v. Pung, 704 F. Supp 922, 956 (D. Minn. 1989), aff'd, 920 F.2d 525 (8th Cir. 1980), quoting Ramos v. Lamm, 639 F.2d 559, 567 n.10 (10th Cir. 1980), cert. denied, 450 U.S. 1041 (1981). See, e.g., Lareau, 651 F.2d at 106 ("To inform itself of contemporary standards, the district court considered correctional guidelines and standards from a number of organizations"). See also Williams v. Edwards, 547 F.2d 1206, 1214 (5th Cir. 1977) ("In the past we have affirmed findings of constitutional violations based in part on [S]tate code violations. . . . Such a standard is a valuable reference for

what is minimal for human habitation in the public view, thus serving as an indicator of evolving notions of decency" [quotation and citation omitted]).

At oral argument, the plaintiffs were unable to point to any area in which they assert that the DOC is not in compliance with the CDC's interim guidance on prisons and jails with respect to COVID-19. When questioned, the plaintiffs conceded that the DOC in fact is in compliance with all CDC interim guidance for correctional facilities. While compliance with professional guidance is not enough, on its own, to establish constitutionality (or a lack thereof), see Bell v. Wolfish, 441 U.S. 520, 543 n.27 (1979), such compliance does provide useful indications to be considered in conjunction with other factors, see Ramos, 639 F.2d at 567 n.10 ("a variance from [S]tate standards or from standards promulgated by certain professional organizations does not establish a per se constitutional violation[;] it is a factor to be considered in determining whether contemporary standards of decency have been met"). The DOC's current compliance with CDC's interim guidance weighs against a determination that the plaintiffs are likely to succeed on the merits of their claims.

Another notable factor is the DOC's current widespread testing program. As stated, testing, contact tracing, and quarantine are considered the sine qua non of any effort to

control the COVID-19 pandemic. See generally Interim Guidance, supra. On March 19, 2020, the DOC first tested a symptomatic inmate for COVID-19. Thereafter during that early period, only inmates who presented as symptomatic, or, in a few cases, those who had been in close contact with an inmate who had tested positive, were being tested for COVID-19. When the plaintiffs first commenced this action, the special master in CPCS v. Trial Court, 484 Mass. at 456-457 (Appendix B), was presenting daily reports showing little to no testing for COVID-19 at many facilities, and, in particular, no testing of inmates at facilities where a correction officer or other staff member had tested positive for COVID-19. Based on the special master's reports, the plaintiffs and the amicus American Civil Liberties Union urged this court to conclude that there had been an Eighth Amendment violation due to an apparent lack of basic contact tracing, testing, and isolation, as recommended by the CDC, and asked us to order testing of all inmates in DOC facilities. At the same time, when the complaint in this case first was filed, and even after the matter was assigned to the Superior Court judge for fact finding, the DOC was asserting difficulty in obtaining tests and a shortage of tests in all facilities.

Since that initial period of a few tests for symptomatic inmates, if a test was recommended by an individual clinician and as tests were available, the DOC has modified its testing

strategies substantially. After oral argument in this case, and increasingly throughout the month of May, the DOC has begun widespread testing of nonsymptomatic inmates, as well as offering testing to all correction officers upon request.

At oral argument, the attorney for the DOC stated that the DOC had access to 10,000 COVID-19 tests, and that the DOC was planning a large-scale testing program. In response to requests by this court for additional information on the subject pursuant to Mass. R. A. P. 16 (l), the DOC clarified that, as of May 11, 2020, it had 2,073 tests in its possession, was using a mobile testing van to conduct tests, had been assured that there was now no limit on the number of tests that it would be able to obtain, and had begun to implement a system-wide testing plan. Under this plan, all inmates and all staff at each facility, regardless of whether they are symptomatic, will be offered tests, and all facilities will have been tested by May 31, 2020, following a schedule of approximately two days of testing at each site.

Current widespread DOC testing efforts, if continued as planned, will provide much of the testing relief that the plaintiffs, and the amicus American Civil Liberties Union, urge this court to order. This further supports the conclusion that the plaintiffs are not likely to succeed on the merits of their claims for violations of the Eighth Amendment.

In sum, on this record, it appears unlikely that the plaintiffs will be able to establish deliberate indifference on the part of the DOC regarding their conditions of confinement as a result of the pandemic.  We turn to consider their claims for violations of substantive due process.

5.  Substantive due process claims for individuals committed under G. L. 123, § 35.  The plaintiffs argue that commitment to a secured facility for substance abuse treatment during the COVID-19 pandemic violates committed individuals' substantive due process rights.

a.  Professional judgment.  In Youngberg, 457 U.S. at 315-316, individuals who had been civilly committed based on intellectual disabilities brought substantive due process challenges regarding their conditions of confinement.  The United States Supreme Court concluded that, "[i]f it is cruel and unusual punishment to hold convicted criminals in unsafe conditions, it must be unconstitutional to confine the involuntarily committed -- who may not be punished at all -- in unsafe conditions."  Id.  Therefore, "when the State takes a person into its custody and holds him [or her] there against his [or her] will the Constitution imposes upon it a corresponding duty to assume some responsibility for his [or her] safety and general well-being."  DeShaney v. Winnebago County Dep't of Social Servs., 489 U.S. 189, 199-200 (1989), citing Youngberg,

supra at 317.  See Williams v. Hartman, 413 Mass. 398, 403 (1992).

Relying on these holdings, the plaintiffs maintain that commitment for substance abuse treatment during the COVID-19 pandemic creates unsafe conditions of confinement.  Under Youngberg, 457 U.S. at 323, however, to establish a violation of substantive due process, it is not sufficient to allege only that conditions are unsafe.  Rather, the test is whether a "decision by [a] professional is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment."[19]  See Hopper v. Callahan, 408 Mass. 621, 626-627 (1990), quoting Youngberg, supra.

The plaintiffs contend that commitment to a secured facility during the COVID-19 pandemic is so contrary to

---

[19] In determining whether there was a violation of substantive due process, some courts have applied the standard of deliberate indifference to decisions made by nonprofessionals.  See, e.g., Lanman v. Hinson, 529 F.3d 673, 684 (6th Cir. 2008).  This court, however, has rejected the application of the deliberate indifference standard to individuals who have been civilly committed because of their intellectual disabilities.  See Hopper v. Callahan, 408 Mass. 621, 627 & n.4 (1990).  Additionally, the United States Supreme Court's decision in Kingsley, 135 S. Ct. at 2473, casts doubt on the applicability of a subjective standard to claims challenging conditions of confinement for nonsentenced individuals.  See Smith v. Washington, 781 Fed. Appx. 595, 597-598 (9th Cir. 2019), quoting Castro v. County of Los Angeles, 833 F.3d 1060, 1071 (9th Cir. 2016), cert. denied, 137 S. Ct. 831 (2017) (applying objective test to civil detainees).

substance abuse treatment principles that it necessarily constitutes a substantial departure from professional judgment. They rely on the COVID-19 guidance from the Substance Abuse and Mental Health Services Administration (SAMHSA), an entity within the United States Department of Health and Human Services, which states that residential treatment "has not been shown to be superior to intensive outpatient treatment." Therefore, "[b]ecause of the substantial risk of coronavirus spread with congregation of individuals in a limited space such as in an inpatient or residential facility, SAMHSA is advising that outpatient treatment options, when clinically appropriate, be used to the greatest extent possible." SAMHSA, Considerations for the Care and Treatment of Mental and Substance Use Disorders in the COVID-19 Epidemic (rev. May 7, 2020).

Contrary to the plaintiffs' characterizations, this guidance does not state that inpatient treatment is never advisable during the pandemic. Rather, SAMHSA states that "[i]npatient facilities and residential programs should be reserved for those for whom outpatient measures are not considered an adequate clinical option[, such as] those with mental disorders that are life threatening." Id. Commitment under G. L. c. 123, § 35, intended to be a "carefully circumscribed . . . tool of last resort," by definition is limited to situations in which the individual poses a likelihood

of serious harm.  See <u>Matter of a Minor</u>, 484 Mass. 295, 311 (2020).  If outpatient treatment, or any other plausibly available option, would "bring the risk of harm below the statutory thresholds that define a likelihood of serious harm," a judge may not commit the subject of a petition to any facility, secure or unsecure.  See <u>id</u>. at 310, citing <u>Matter of G.P.</u>, 473 Mass. at 128-129.

Commitment to a secure facility requires an additional finding that an unsecure facility is unavailable or insufficient.  See G. L. c. 123, § 35.  Once committed, the superintendent of the facility may release an individual early if there is not a likelihood of serious harm.  See <u>id</u>.  These restrictions, if followed, should limit commitment to individuals "for whom outpatient measures are not considered an adequate clinical option," as recommended by SAMHSA.

The plaintiffs have presented no evidence of individuals having been committed in contravention of these requirements.  Nonetheless, the plaintiffs maintain that commitment for substance use disorder during the pandemic constitutes a violation of professional judgment in every case.  Without a more complete factual record, and without expert guidance, we are not able to reach such a broad conclusion.

b.  <u>Reasonable relation</u>.  The plaintiffs argue also that civil commitment for substance abuse treatment during the COVID-

19 pandemic does not advance sufficiently the treatment goals of G. L. c. 123, § 35, and therefore violates their substantive due process rights. Due process under the Federal Constitution "requires that the conditions and duration of confinement under the [statute] bear some reasonable relation to the purpose for which persons are committed." Seling v. Young, 531 U.S. 250, 265 (2001), citing Foucha v. Louisiana, 504 U.S. 71, 79 (1992). As the DOC notes in its opposition, however, under the Massachusetts Declaration of Rights, civil commitment is subject to a higher level of judicial review, i.e., strict scrutiny. See Matter of a Minor, 484 Mass. at 309. Under strict scrutiny review, a statute cannot stand unless it is "narrowly tailored to further a legitimate and compelling governmental interest and [is] the least restrictive means available to vindicate that interest." Commonwealth v. Weston W., 455 Mass. 24, 35 (2009).

Both the "reasonable relation" standard and review under strict scrutiny require the government to identify a purpose for which a statute was enacted, and to show how the government action is connected to that purpose. Review under strict scrutiny, however, requires the government meet a much higher burden for both elements of the test. Rather than simply identifying a permissible purpose, the government must show that the statute is designed to address a compelling government interest. Otherwise put, here, rather than requiring only that

the civil confinement be reasonably related to the government's interest, the confinement must be narrowly tailored to that interest as well as the least restrictive means by which to accomplish the intended goal.

Because the plaintiffs presented their arguments to us under the Federal standard, we address it first.  In Doe v. Gaughan, 808 F.2d 871, 874 (1st Cir. 1986), the plaintiffs argued that, because they were committed to a correctional institution, rather than a mental health facility, the nature of their confinement was not reasonably related to the purpose for which they were confined.  The United States Court of Appeals for the First Circuit disagreed; the court concluded that the secure facility bore a "reasonable relationship both to the [S]tate's public safety needs and to the patients' own therapeutic interests in a secure environment."  See id. at 878.  Conversely, in Jackson v. Indiana, 406 U.S. 715, 738-739 (1972), the United States Supreme Court held that the confinement of an incompetent defendant for more than three years bore no reasonable relation to his commitment because there was no substantial probability of his becoming competent.

General Laws c. 123, § 35, states that the purpose of commitment is "inpatient care for the treatment of an alcohol or substance use disorder."  This treatment is intended to promote the health and safety of the individual committed and others, as

demonstrated by the statutory requirement that a committed individual pose a danger to him- or herself, or a member of the community.  See G. L. c. 123, § 35.  Therefore, if patients are not receiving meaningful and reasonably effective treatment for substance use disorders, which advances their health and safety, their commitment violates Federal due process requirements.

The DOC and the Hampden County sheriff's office report that committed individuals are held for the first fourteen days in a separate unit and do not participate in group programming.  The plaintiffs argue that, during those fourteen days, committed individuals receive "next to no treatment," and thus that their confinement bears no reasonable relationship to the purpose of commitment.  The DOC reports, however, that after an initial three-day observation period has ended, and the individual has been "detox cleared," the individual receives daily "individual services" from a substance abuse disorder counsellor.  The Hampden County sheriff's office reports that individuals receive substance abuse treatment during their first fourteen days of commitment.  The record contains no information regarding the nature and extent of these services.

We agree that, if the first fourteen days involve no real treatment, or only minimal treatment, the plaintiffs would have a strong claim.  The DOC's deputy commissioner of clinical services and reentry avers that many individuals are released

after thirty days of confinement.  As the plaintiffs note, the first fourteen days of confinement account for almost one-half of the total period of commitment for those individuals. Without more information regarding the limited treatment provided, however, and without expert testimony regarding the efficacy of that limited treatment, we cannot conclude that commitment during the pandemic bears no reasonable relation to the purposes of the statute.

c.  Strict scrutiny.  As stated, the plaintiffs' complaint and its arguments before this court rest on substantive due process requirements under the Federal standard.  Because civil commitment involves a loss of liberty, a fundamental constitutional right, however, we also consider the plaintiffs' constitutional claims under the more stringent standard embodied in the Massachusetts Declaration of Rights.  "In substantive due process analysis, the nature of the individual interest at stake determines the standard of review that courts apply when deciding whether a challenged statute meets the requirements of the due process clause."  Aime v. Commonwealth, 414 Mass. 667, 673 (1993).  See R.B., petitioner, 479 Mass. 712, 717-718 (2018); Commonwealth v. Travis, 372 Mass. 238, 246 (1977).

Freedom from physical restraint is a paradigmatic fundamental right, essential to a free society.  See Pembroke Hosp. v. D.L., 482 Mass. 346, 347 (2019), citing Matter of E.C.,

479 Mass. 113, 119 (2018). Civil commitment under G. L. c. 123, § 35, thus is subject to strict scrutiny under the due process protections in the Massachusetts Declaration of Rights. Accordingly, the statute "must be narrowly tailored to serve a compelling governmental interest" and "also be the least restrictive means available to vindicate that interest." Massachusetts Gen. Hosp. v. C.R., 484 Mass. 472, 489 (2020).

Here, the question whether G. L. c. 123, § 35, could survive strict scrutiny review, absent a pandemic, is not before us. As nothing in the plaintiffs' filings or the record touches on the question of strict scrutiny, we assume without deciding, as we did in Matter of a Minor, 484 Mass. at 309 n.9, that the statute at baseline does not violate substantive due process. Accordingly, we examine whether the current public health crisis alters the strict scrutiny analysis such that commitment to a secure facility during the COVID-19 pandemic must be unconstitutional.

As stated, the purpose of commitment for substance abuse treatment is to promote the health and safety of the committed individual and others through such treatment. We have no evidence that the dangers of substance use disorders, or the need for treatment, have diminished during the COVID-19 pandemic. Thus, issues regarding COVID-19 have no impact on the question whether there is a compelling and legitimate government

interest.

The pandemic, however, may affect whether commitment is narrowly tailored to that interest. If the commitment and treatment do not promote effectively the government's interest in the individual's and others' health and safety, the government action cannot survive strict scrutiny. See Grutter v. Bollinger, 539 U.S. 306, 333 (2003) ("means chosen . . . must be specifically and narrowly framed to accomplish [their] purpose" [citation omitted]). In this regard, the increased risk of COVID-19 transmission in congregate settings is highly pertinent.

As we recognized in CPCS v. Trial Court, 484 Mass. at 436, "confined, enclosed environments increase transmissibility" of COVID-19. "[M]aintaining six feet of distance between oneself and others . . . may be nearly impossible" in these settings. Id. As with the jails and prisons at issue in that case, "proper sanitation is also a challenge" for the commitment facilities, as shown by DPH inspections in January and February of 2020, identifying dozens of repeat violations at MASAC and the Stonybrook facilities.[20]  Id. at 436-437.

---

[20] The record here contains only the plaintiffs' summaries of what the DPH reports state, and not the actual reports. We have taken judicial notice of some of the publicly accessible reports, which are available for download on the DPH's website, and which are consistent with the plaintiffs' representations.

At the same time, these facilities have taken significant steps to lessen the risk of transmission of COVID-19. Staff members are required to wear masks when in contact with patients, as well as gloves for some activities, and all committed individuals have been given masks. Newly committed individuals are placed in a separate unit for the first fourteen days and are not permitted to attend group sessions. All persons entering the facilities are screened for symptoms of COVID-19. Soap and hand sanitizer are widely available, and multiple other hygiene-related protocols have been instituted.

Although the expert affidavits discuss the general risk of transmission in correctional facilities, they do not specifically address conditions at MASAC or in the Stonybrook facilities. Nor do they address whether the pandemic changes the need for or the efficacy of commitment to a secure facility for substance use disorder treatment. Moreover, on this record, the plaintiffs have not presented evidence indicating that a less restrictive alternative would have been sufficient to avoid a likelihood of serious harm for any currently committed individuals. See Massachusetts Gen. Hosp., 484 Mass. at 483–484 ("record . . . reveals no realistic alternative"). Given the limited record before us, we cannot say that there has been a

fundamental change in the need for or efficacy of commitment.[21]
We conclude that the plaintiffs have not shown a likelihood of
success on the merits.  See Garcia v. Department of Hous. &
Community Dev., 480 Mass. 736, 747 (2018).

Nonetheless, we see fit to address the situation under our
supervisory authority.  Going forward, a judge shall not commit
an individual under G. L. c. 123, § 35, unless the judge finds
that the danger posed by the individual's substance use disorder
outweighs the risk of transmission of COVID-19 in congregate
settings.  "Given the high risk posed by COVID-19 for people who
are more than sixty years of age or who suffer from a high-risk
condition as defined by the CDC, the age and health of [the
individual] should be factored into [the] determination." CPCS
v. Trial Court, 484 Mass. at 449.  Additionally, the judge must
find that commitment is necessary notwithstanding the treatment
limitations imposed by quarantine protocols.  A judge's findings
may be made in writing or orally on the record.  These
requirements will remain in effect for the duration of the

---

[21] These considerations apply as much to nonsecure,
inpatient treatment facilities as they do to the secure
facilities at issue here.  The record is devoid of any
information regarding the conditions present in nonsecure
treatment facilities in the Commonwealth.  Therefore, we have no
basis for determining whether COVID-19 transmission is more
likely in secure locations, and accordingly are unable to make a
determination on the plaintiffs' alternative request for
transfers to nonsecure facilities.

COVID-19 state of emergency, unless altered by further order of this court.  These are additional, temporary requirements beyond those imposed by G. L. c. 123, § 35, due process principles, and any other applicable law.  See Matter of a Minor, 484 Mass. at 307-310; Matter of G.P., 473 Mass. at 120-122, 124-129.

Furthermore, as with the bail determinations that were the subject of much of our decision in CPCS v. Trial Court, 484 Mass. at 434-436, current orders of commitment may have been made without consideration of the crisis currently ravaging the planet.  We therefore conclude that the risks of COVID-19 transmission constitute a "material change in circumstances" with regard to any order of commitment currently in effect.  See Littles v. Commissioner of Correction, 444 Mass. 871, 878 (2005); Commonwealth v. Cronk, 396 Mass. 194, 196 (1985).  See also CPCS v. Trial Court, supra at 435 ("risks inherent in the COVID-19 pandemic constitute a changed circumstance" under bail statutes).  Any individual who is committed pursuant to G. L. c. 123, § 35, at the time of the issuance of the slip opinion in this case may file a motion for reconsideration of the commitment order.  Hearings shall take place by videoconference or teleconference no later than two business days after the filing of the motion.  A decision on the motion shall be rendered promptly.

6.  Ongoing response to the continuing pandemic.

Conditions as a result of the pandemic, and society's response to them, are changing rapidly. The CDC's interim guidance itself states that it is subject to change and that individual guidelines "may need to be adapted based on individual facilities' physical space, staffing, population, operations, and other resources and conditions." Interim Guidance, supra at 1. While the court acknowledges the DOC's significant efforts to reduce the risks for incarcerated individuals due to the pandemic, to date the crisis generated by the pandemic continues worldwide. All of the defendants must remain vigilant in continuing to respond swiftly to ongoing and changed conditions brought about as a result of the pandemic, while retaining the testing, contact tracing, and quarantining policies they now have put in place, that the CDC recognizes as the heart of any plan to combat the pandemic.

Moreover, as the commissioner's counsel acknowledged at oral argument, while the pandemic continues, the lockdown conditions instituted by the DOC to prevent a serious risk of harm themselves risk becoming Eighth Amendment violations. The CDC's interim guidance notes that measures taken by correction facilities to reduce transmission of COVID-19, such as canceling activities and visitation, may be deleterious to the mental health of inmates. These effects necessarily will be even more pronounced for inmates in solitary cells, who are segregated

from all other humans for twenty-three or more hours per day. Solitary confinement, even when imposed for good reason, "bears 'a . . . terror and peculiar mark of infamy.'"  See Davis v. Ayala, 135 S. Ct. 2187, 2209 (2015) (Kennedy, J., concurring), quoting In re Medley, 134 U.S. 160, 170 (1890).  "[C]ommon side-effects of solitary confinement include anxiety, panic, withdrawal, hallucinations, self-mutilation, and suicidal thoughts and behaviors."  Davis, supra at 2210, citing Grassian, Psychiatric Effects of Solitary Confinement, 22 Wash. U.J.L. & Pol'y 325 (2006).  "Suicides, attempts at suicide, and self-mutilations are common among inmates thus confined."  Ruiz v. Estelle, 503 F. Supp. 1265, 1360 (S.D. Tex. 1980), aff'd in part, rev'd in part, 679 F.2d 1115, amended in part, vacated in part, 688 F.2d 266 (5th Cir. 1982), cert. denied, 460 U.S. 1042 (1983).  Thus, "even the permissible forms of solitary confinement might violate the Eighth Amendment if [i]mposed . . . for too long a period" (quotations and citation omitted).  Jackson v. Meachum, 699 F.2d 578, 582 (1st Cir. 1983).  See Hardwick v. Ault, 447 F. Supp. 116, 126 (M.D. Ga. 1978) ("indefinite duration of confinement shock[ed] the conscience," especially in cell block "where prisoners [would] go for several days without leaving their cell except briefly").

Similarly, deprivation of exercise may be "'reasonable' in certain situations, such as during a 'state of emergency.'"

Thomas v. Ponder, 611 F.3d 1144, 1155 (9th Cir. 2010). Long-term "deprivation of exercise" on the other hand, "may constitute an impairment of health forbidden under the [E]ighth [A]mendment." Miller v. Carson, 563 F.2d 741, 751 n.12 (5th Cir. 1977), citing Estelle, 429 U.S. at 97. See Spain v. Procunier, 600 F.2d 189, 199 (9th Cir. 1979) ("denial of fresh air and regular outdoor exercise and recreation [over period of years] constitutes cruel and unusual punishment"); Ruiz, 503 F. Supp. at 1367 ("Even if accomplished according to appropriate procedures and for valid reasons, long term confinement of inmates in administrative segregation, without opportunities for recreation, constitutes cruel and unusual punishment"); Sinclair v. Henderson, 331 F. Supp. 1123, 1131 (E.D. La. 1971) ("Confinement for long periods of time without the opportunity for regular outdoor exercise does, as a matter of law, constitute cruel and unusual punishment . . .").

At this juncture, it appears that the COVID-19 pandemic will continue to demand extraordinary, and coordinated, efforts by all parties, as well as the courts. This is so also with respect to the different entities within the executive branch. Even the commissioner acknowledged at oral argument that reducing the number of incarcerated individuals being held in any given facility, if it can be done lawfully, is a desirable goal for controlling the spread of communicable diseases such as

COVID-19. In their brief, the plaintiffs point to numerous measures that they assert have been undertaken in other States to reduce prison populations, among them release to home confinement, enhanced good time sentence deductions, and early parole.

With respect to one such measure, release to home confinement for those who have been serving a sentence, for example, the commissioner asserted before the hearing judge that she believes the DOC has no authority to authorize such releases for inmates who are serving sentences. We agree with Chief Justice Gants that G. L. c. 127, §§ 48, 49, 49A, and this court's holding in Donohue, 452 Mass. at 265, indeed would allow the commissioner to release certain individuals who currently are serving a sentence in a prison or house of correction to home confinement, under specified conditions, prior to the completion of their committed sentences, for certain educational, employment, and training programs. See post at      .

The specific measures the defendants might choose to reduce the number of incarcerated individuals in DOC custody are not as important as the goal of reduction, and not ordinarily for a court to decide. Nonetheless, the DOC's argument that, due to concerns regarding separation of powers under art. 30 of the Massachusetts Declaration of Rights, this court would never have

authority to order a reduction in the prison population is unavailing; should the court conclude, at a later point, that the defendants have held inmates under unconstitutional conditions of confinement, it would have authority to issue orders necessary to remedy that situation.

As two justices of the United States Supreme Court commented recently with respect to the determination by a United States Court of Appeals to stay a Federal District Court judge's order granting a preliminary injunction sought by a group of particularly vulnerable incarcerated inmates due to their conditions of confinement, "[i]t has long been said that a society's worth can be judged by taking stock of its prisons. That is all the truer in this pandemic, where inmates everywhere have been rendered vulnerable and often powerless to protect themselves from harm. May we hope that our country's facilities serve as models rather than cautionary tales." Valentine vs. Collier, U.S. Supreme Court, No. 19A1034 (May 14, 2020).

Conclusion. The motion for a preliminary injunction is denied. The matter is transferred to the Superior Court, where litigation on the complaint shall proceed as an emergency matter, with due speed in consideration of the circumstances, before the same Superior Court judge who was designated to make findings of fact with respect to the motion for a preliminary injunction. In addition to rulings on the merits, the judge

shall resolve all questions of class certification, including any amendment of the complaint or substitution of parties.

<u>So ordered</u>.

GANTS, C.J. (concurring, with whom Lenk and Budd, JJ.,
join).  The essence of this case is summarized in a single
sentence in the judge's findings of fact:  "Commissioner Mici
[(commissioner)] believes that [the Department of Correction
(DOC)] is doing the best it can to manage the COVID-19 crisis
given the physical layout of the facilities and the inmate
population."  The record supports her belief that the DOC is
doing "the best it can" to attempt to prevent the COVID-19 virus
from entering prisons and to limit its spread within the
facilities that it has entered.  And it is likely true that, for
all practical purposes, the "physical layout" of prison
facilities is a "given," in that it cannot be materially altered
quickly enough to make a significant difference.

But even acknowledging that public safety would not permit
a drastic reduction of the prison population, the inmate
population is not a "given."  The commissioner herself
recognizes, as do the World Health Organization[1] and the United

---

[1] "Enhanced consideration should be given to resorting to
non-custodial measures at all stages of the administration of
criminal justice, including at the . . . post-sentencing
stage[].  Priority should be given to non-custodial measures for
alleged offenders and prisoners with low-risk profiles and
caring responsibilities . . . ."  World Health Organization
Regional Office for Europe, Preparedness, Prevention and Control
of COVID-19 in Prisons and Other Places of Detention, at 4 (Mar.
15, 2020), http://www.euro.who.int/__data/assets/pdf_file/0019
/434026/Preparedness-prevention-and-control-of-COVID-19-in-
prisons.pdf [https://perma.cc/4ZGQ-RN5U].

States Department of Justice,[2] that measures should be taken to reduce the inmate population and that doing so can help to contain the spread of COVID-19.  To be sure, the commissioner makes clear that any such reduction should be done in a manner that is consistent with law and appropriate in light of the health and safety of the public.  I agree, and I write separately from the court's opinion (with which I wholeheartedly agree) to make three points.  First, there is considerably more that the DOC and the parole board can do to reduce the inmate population, consistent with law and appropriate in terms of public health and safety.  Second, as the pandemic drags on, it is even more important to press forward with such reductions because the current lockdown that is being used by the DOC to contain the virus cannot reasonably continue indefinitely.  And third, although what the DOC and parole board are doing now may not likely demonstrate a reckless disregard for the health and safety of prisoners arising from the risk of transmission of the

---

[2] On March 26, 2020, and again on April 3, 2020, the United States Attorney General instructed the Federal Bureau of Prisons to prioritize the use of home confinement as a tool for combatting the risk that COVID-19 poses to vulnerable inmates while protecting public safety.  See Office of the Attorney General, Prioritization of Home Confinement as Appropriate in Response to COVID-19 Pandemic (Mar. 26, 2020), https://www .justice.gov/file/1262731/download [https://perma.cc/3RKS-8FYN]; Office of the Attorney General, Increasing Use of Home Confinement at Institutions Most Affected by COVID-19 (Apr. 3, 2020), https://www.justice.gov/file/1266661/download [https: //perma.cc/RK4L-4B93].

COVID-19 virus, continuing unchanged along that same path in the months ahead might constitute reckless disregard, especially if we are hit with a new wave of COVID-19 cases.

1. <u>More can be done to reduce the prison population</u>. In 2019, approximately 600 inmates were released each month from DOC custody. Those releases were offset by 557 admissions per month, yielding a net monthly reduction of 43 inmates. However, as a result of the pandemic, the number of criminal admissions has dramatically fallen, from 190 in January and 161 in February 2020, to 87 in March and 15 in April. Given the sharp reduction in criminal admissions, one would expect that the over-all prison population would naturally fall, and it has by approximately eight percent between January 1 and May 21.[3] But the vast majority of this decrease arises from the drop in admissions; actual releases grew only modestly in April 2020 to 526 (compared to an average of 424 in January through March 2020), with virtually all of the increase in releases arising from an increase in parole permits in April to 141 (compared to a monthly average of 52 in January through March 2020). In contrast, the county jail population, in large part fueled by

---

[3] There were 7,923 inmates in DOC custody on January 1, 2020, see MA DOC Jan 1 Inmate Snapshot, https://public.tableau .com/profile/madoc#!/vizhome/MADOCJan1Snapshot/Jan1Snapshot, dropping to 7,278 by May 21, see May 21, 2020 Special Master's Report.

our decision in Committee for Pub. Counsel Servs. v. Chief Justice of the Trial Court, 484 Mass. 431 (2020), fell more than thirty per cent between April 5 and May 21, 2020.  See May 21, 2020 Special Master's Report.  To be sure, it is far easier to release detainees who have yet to be tried than sentenced prisoners.  But the fact remains that more inmates can be released in accordance with law, without compromising public health and safety.

a.  Home confinement.  The commissioner claims that she does not have the legal authority to allow any sentenced prisoner to serve any part of a prison sentence in home confinement.  The commissioner is mistaken.

Under G. L. c. 127, § 48, "[t]he commissioner shall establish and maintain education, training and employment programs for persons committed to the custody of the [DOC]. . . . Such programs shall include opportunities for academic education, vocational education, vocational training, other related prevocational programs and employment, and may be made available within correctional facilities or, subject to the restrictions set forth in [G. L. c. 127, §§ 49 and 86F], at other places approved by the commissioner or administrator" (emphasis added).  Id.  General Laws c. 127, § 49, provides:

> "The commissioner of correction, or the administrator of a county correctional facility, subject to rules and regulations established in accordance with the provisions

of this section, may permit an inmate who has served such a
portion of his sentence or sentences that he would be
eligible for parole within eighteen months to participate
in education, training, or employment programs established
under [§ 48] outside a correctional facility . . . .  In
the case of a committed offender who participates in any
program outside a correctional facility established under
[§ 48], the time spent in such participation shall be
credited toward the serving of his sentence in the same
manner as though he had served such time within the
facility. . . .  The commissioner or such administrator
shall make and promulgate rules and regulations regarding
programs established under [§ 48] outside correctional
facilities.  Such rules and regulations shall include
provisions for reasonable periods of confinement to
particular correctional facilities before a committed
offender may be permitted to participate in such programs
and provisions for feeding, housing and supervising
participants in such programs in such manner as will be
calculated to maintain morale and prevent the introduction
of contraband to the facility."[4,5]

In Commonwealth v. Donahue, 452 Mass. 256 (2008), we
considered whether a sheriff had the authority under § 48 and
§ 49 to release a prisoner from a house of correction and place
him in home confinement under a global positioning system (GPS)
monitoring program where the prisoner had an approved home and
work plan and was monitored by a GPS bracelet.  We concluded
that "G. L. c. 127, §§ 48, 49, and 49A, provide specific
legislative authorization for the GPS program and for the

---

[4] Participation in such programs is limited for prisoners
serving a life sentence, for sex offenders, and for prisoners
who were sentenced for specified violent crimes.  See G. L.
c. 127, § 49.

[5] General Laws c. 127, § 86F, applies only to sheriffs, not
to the commissioner.

placement of Donohue, or similarly situated inmates, in it."
Id. at 265.  We specifically rejected the argument that these
statutes did not permit home confinement, declaring that "[t]o
the contrary, the statutory scheme suggests a legislative intent
to allow this kind of arrangement."  Id. at 266.  The
commissioner has the same authority under these statutes to
place prisoners in home confinement, monitored by a GPS
bracelet, as part of an inmate's participation in an education,
training, or employment program.

General Laws c. 127, § 49A, requires the commissioner to
establish in each correctional facility a committee to evaluate
the behavior and conduct of inmates within the prison and
recommend whether an inmate "shall be permitted to participate
in any program outside a correctional facility, exclusive of
parole."  There is nothing in the record regarding the
activities of these committees and no explanation as to why,
especially at a time when the commissioner recognizes the need
to reduce the prison population, eligible prisoners who have
demonstrated good behavior and conduct have not been approved
for home confinement to participate in education, employment, or
training programs.

b.  Parole release.  As I have noted, the parole board has
stepped up its pace of activity and has released nearly three
times more prisoners in April than it did on average in the

first three months of this year.  But there are at least two ways in which the parole board can release more prisoners, consistent with its statutory obligation to release a prisoner on parole "only if the board is of the opinion, after consideration of a risk and needs assessment, that there is a reasonable probability that, if the prisoner is released with appropriate conditions and community supervision, the prisoner will live and remain at liberty without violating the law and that release is not incompatible with the welfare of society." G. L. c. 127, § 130.

First, § 130 requires the parole board to make two determinations:  whether "there is a reasonable probability that . . . the prisoner will live and remain at liberty without violating the law" and whether "release is not incompatible with the welfare of society."  Id.  With respect to the second determination, it is appropriate for the parole board to consider whether the prisoner has tested positive for COVID-19 and, if so, whether he or she could be safely quarantined and medically monitored or treated upon release.  But it is also appropriate for the parole board to consider the increased risk to the inmate, to fellow inmates, and to the general public of continuing custody in a prison where he or she is particularly vulnerable to an outbreak of COVID-19 given the close quarters and difficulties of social distancing in a prison.  This

consideration is most acute in prisoners who are at special risk of death or serious illness from COVID-19 because of their advanced age or compromised immune system. In Christie v. Commonwealth, 484 Mass. 397, 401-402 (2020), we declared in the context of a judge's determination whether to stay a defendant's execution of sentence pending appeal:

> "We also note that the health risks to persons in custody arising from this pandemic require that we adjust the analysis applied to motions to stay the execution of sentence pending appeal. In ordinary times, in considering the second factor, a judge should focus on the danger to other persons and the community arising from the defendant's risk of reoffense. See [Commonwealth v. Cohen (No. 2), 456 Mass. 128, 132 (2010); Commonwealth v. Hodge (No. 1), 380 Mass. 851, 855 (1980)]. In these extraordinary times, a judge deciding whether to grant a stay should consider not only the risk to others if the defendant were to be released and reoffend, but also the health risk to the defendant if the defendant were to remain in custody. In evaluating this risk, a judge should consider both the general risk associated with preventing COVID-19 transmission and minimizing its spread in correctional institutions to inmates and prison staff and the specific risk to the defendant, in view of his or her age and existing medical conditions, that would heighten the chance of death or serious illness if the defendant were to contract the virus." (Emphases in original.)

A comparable adaptation to the pandemic should be made to the parole board's evaluation of whether "release is not incompatible with the welfare of society" under § 130.

Second, some inmates who are granted parole because they meet the criteria in § 130 do not promptly obtain the parole permits needed for release and must first obtain a transfer to a long-term residential facility or a step-down to a lower-

security facility before they can receive their permits.  In this pandemic era, such a condition of release would prove a "Catch-22" situation for many inmates otherwise eligible for parole release:  because all transfers among facilities have ceased, such inmates could not meet the condition established for their release.  The parole board should reevaluate all such conditions where they prevent the release of those whom the board has already determined will be unlikely to reoffend upon their release.

c.  <u>Earned good time</u>.  The majority of prisoners who are released from custody are released because they have completed their sentence.  The DOC declares that it "has no control" over the completion of sentences.  But to the extent that the commissioner has the authority to grant good time credit of up to fifteen days per month under G. L. c. 127, § 129D, plus an additional ten days of credit for the successful completion of a program, the commissioner has the ability to reduce a prisoner's sentence by approximately one-half (180 days per year if the prisoner receives fifteen days per month, and another ten days for each completed program).  The pandemic put a temporary end to the programs that enabled inmates to earn good time, and the commissioner deserves credit for allowing inmates to earn seven and one-half days per month by maintaining a diary.  But with more than two months having passed since the Governor's

announcement that a state of emergency existed, it is time for the commissioner to devise new programs that can be accomplished by inmates in the midst of a pandemic that would enable them to earn the full complement of possible good time, including completion credit, and reduce the over-all length of their sentences.

2.  <u>Planning beyond the lockdown</u>.  To prevent the COVID-19 virus from entering DOC facilities and to mitigate its spread in those facilities that already had cases, the commissioner initiated a system-wide lockdown on April 3, 2020.  In practice, this means that inmates who are housed in cells remain there for twenty-three hours a day, and those who live in dormitory-style housing cannot leave their units.  Inmates eat meals in their cells or units; use of gyms, weight rooms, and outdoor spaces is strictly limited; and work opportunities and classes have been suspended.

These stringent policies might have been necessary to quell the outbreak by reducing contact between inmates and by making it easier to conduct contact tracing when positive cases were identified.  But while this may have averted a worst-case scenario in the early days of the pandemic, the court's opinion notes that the DOC may soon face another challenge:  the mental health impact of an extended lockdown, with its own implications

under the Eighth Amendment to the United States Constitution and art. 26 of the Massachusetts Declaration of Rights.

According to the DOC, this is the first time in recent memory that the entire Massachusetts prison system has been locked down because of health risks.  The longest recorded lockdown at any DOC facility lasted for four months in 1995 following an assault on a correction officer at the Massachusetts Correctional Institution at Cedar Junction.  This system-wide lockdown has already been in place for two months, but I believe that the DOC recognizes that it cannot reasonably continue for the many months that will pass until a COVID-19 vaccine becomes widely available.  The isolation arising from a lockdown over time will have increasingly severe mental health ramifications, particularly in a population that already has a higher-than-average prevalence of mental health issues.  And if the lockdown were to continue, there may come a time when the lockdown itself raises serious questions about the DOC's deliberate indifference to inmate mental health.

I do not profess to know what should be the next step beyond lockdown; I know only that there will be a need for a next step, that it must be carefully considered by correctional, public health, and mental health professionals, and that, as we are learning from our experience outside the prison walls, reopening to permit increased human interaction poses even more

challenges than the formidable challenges arising from sheltering in place. Soon, the DOC will have to develop protocols that are, to the extent possible, protective of both inmate physical health <u>and</u> mental health. And doing so will be easier and more likely to succeed with a smaller prison population, which will provide greater potential for social distancing and give prison superintendents more flexibility in their use of available prison space, cells, and facilities.

3. <u>Planning ahead for a second wave</u>. I recognize that, when it became apparent that COVID-19 had spread through Massachusetts communities, the DOC had to improvise quickly and make adjustments to avoid rampant spread of the virus in its correctional facilities. But what is appropriate in reacting to an immediate and unpredictable threat might not be appropriate as the threat drags on over many months. Reducing the size of the prison population, especially the size of the elderly and infirm prison population, in a manner that is consistent with law and public safety takes time, both to identify appropriate candidates for release and to ensure that they have appropriate release plans. But there will be time before the fall to accomplish sensible reductions in the size of the prison population, including the release or transfer to home confinement of many elderly and medically vulnerable prisoners, to give prison superintendents the better options to protect the

physical and mental health of inmates that come with fewer prisoners.  With experts warning of a potential resurgence of COVID-19 in the winter, see CDC Director Warns Second Wave of Coronavirus Is Likely to Be Even More Devastating, Wash. Post, Apr. 21, 2020, https://www.washingtonpost.com/health/2020/04 /21/coronavirus-secondwave-cdcdirector [https://perma.cc/3SVZ -BQCX], the DOC has the opportunity and, indeed, the obligation to begin preparing for that possibility.  Policies that pass constitutional muster in the face of an unprecedented emergency may not be constitutionally sufficient after the department has had time to consider and plan its response to a now-foreseeable threat.